178                    July 29, 2020                    No. 10

IN THE OREGON TAX COURT
REGULAR DIVISION

DEPARTMENT OF REVENUE,
*Plaintiff,*

*v.*

Terrence SEDGEWICK
and Susannah Sedgewick,
*Defendants.*

(TC 5341)

On cross-motions for summary judgment, taxpayers argued that they did not realize gain when they used part of a Business Energy Tax Credit (BETC) they had purchased at a discount from a third party. The Department of Revenue (the department) asserted that taxpayers' taxable income included the difference between the amount of BETC used as a credit and the amount taxpayers paid for the BETC. The court determined that taxpayers' rights in the BETC were "property" for purposes of IRC sections 61(a)(3) and 1001, because the certificates were held in taxpayers' names, they had the exclusive right to use the BETC, and there were no facts that might put the use of the BETC out of taxpayers' reach. *Drye v. United States*, 528 US 49, 58, 120 S Ct 474, 145 L Ed 2d 466 (1999) (defining federal test for identifying "property"). Under the broad interpretation of the word "disposition" in section 1001(a), the court further concluded that taxpayers disposed of property when they used the credit to offset their Oregon tax liability. The court held that taxpayers realized gain equal to the difference between the amount of tax liability offset by the BETC and their basis in the BETC.

Oral argument on cross-motions for summary judgment was held on June 27, 2019, in the courtroom of the Oregon Tax Court, Salem.

Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Plaintiff Department of Revenue.

Richard H. Gassner and Sherri Y. Ness, Attorneys at Law, filed the cross-motion and argued the cause for Defendants.

Decision for Plaintiff rendered July 29, 2020.

**ROBERT T. MANICKE, Judge.**

Defendants (taxpayers) purchased certain amounts of an Oregon income tax credit commonly known as the Business Energy Tax Credit (BETC) from one or more third parties at a discount and used the BETC to offset their

Oregon personal income tax liability in three consecutive years. Plaintiff Department of Revenue (the department) adjusted taxpayers' returns to include as taxable income the difference between the amount of BETC they had used as a credit and the amount they had paid for the BETC.

In response to notices of assessment asserting additional tax due, the substantial understatement penalty, and interest, taxpayers timely filed a complaint in the Magistrate Division on May 2, 2017. The department appeals from the magistrate's decision concluding that taxpayers did not have gain constituting gross income when they used their BETC. The parties have filed cross-motions for summary judgment on stipulated facts. The tax years at issue are 2012, 2013, and 2014 (the "Subject Years").

## I.   FACTS

The material facts are not in dispute. At all relevant times, taxpayers have been Oregon residents and have filed joint Oregon personal income tax returns as spouses in a marriage. Taxpayers purchased three Oregon BETC certificates over the course of several years, each time for a discounted purchase price that was 33 percent of the amount of credit they would be allowed to use. The department does not contend that the discounted purchase price deviated from the statutorily defined "present value" at which BETC was required to be sold. *See* ORS 469B.148.[1]

During each of the Subject Years, taxpayers filed a return (for the preceding year)[2] on which they used portions of the purchased BETC to offset their tax liability (for that preceding year). In computing their Oregon taxable income for each *Subject* Year, taxpayers did not include in their taxable income any amount attributable to their use of BETC on the return for the preceding year. In other words, taxpayers did not treat the act of filing the preceding year's return on which they used BETC as triggering gain or other income for the tax year during which they were filing the return.

---

[1]  Unless otherwise indicated, citations to the Oregon Revised Statutes (ORS) are to the 2013 edition.

[2]  A personal income tax return generally is not due until April 15 of the following year. ORS 314.385(1)(a).

On their federal income tax return for each Subject Year, taxpayers reported an itemized deduction for state taxes that included an amount that they explained was attributable to their use of the BETC.

## II.  ISSUE

Did taxpayers realize gain when they used an amount of BETC to offset their Oregon income tax liability?

## III.  ANALYSIS

### A.  *Legal Background on the BETC*

Until the legislature phased out the BETC program around the time of the Subject Years,[3] Oregon law allowed a project owner[4] proposing to construct and own an "energy facility"[5] to apply for the BETC as a credit against Oregon income tax liability. The BETC was a percentage of the "certified cost" of the project, and it generally was required to be claimed over a period of five years.[6] *See* ORS 315.354(1)(a), (c). The amount of BETC available for a project could be substantial, depending on the type of project and the amount of certified costs. One frequently used variety of BETC could range up to a total of $10 million in BETC per project. *See* ORS 469B.142(1)(a) (capping potential certified cost at $20 million); ORS 315.354(1)(c) (allowing BETC equal to 10 percent of certified cost in each of five succeeding tax years). If the Oregon income tax liability of the person holding the BETC was insufficient to absorb the amount of credit available for a particular year, the holder could carry

---

[3] *See* ORS 315.357.

[4] This order generally uses the term "project owner" to refer to the prospective or actual owner who becomes eligible for a BETC by investing in equipment, fixtures, or other real or tangible property, as opposed to a person eligible for the BETC by having purchased it.

[5] *See* ORS 469B.130(5) (defining "energy facility" generally to include capital investments that provide energy from renewable resources). Earlier editions of the ORS codified the BETC provisions in chapter 469; where necessary, the court refers to these, and to editions of the Oregon Administrative Rules (OAR), by date. Although there were numerous amendments to the BETC provisions from 2008 through 2013, unless otherwise indicated those amendments are not material to the case.

[6] The court regards as synonymous the terms "claiming" a credit and "using" a credit to offset tax liability. *See Con-Way Inc. & Affiliates v. Dept. of Rev.*, 353 Or 616, 302 P3d 804 (2013).

the excess forward for use in the next succeeding year, up to eight years. ORS 315.354(6).[7] However, the BETC was "non-refundable," meaning that the holder could not receive any part of its value in the form of a cash payment from the state. ORS 315.354(1)(a)-(c) (amount of credit allowed on a tax return "may not exceed the tax liability of the taxpayer").

The application process required two major steps. First, before starting construction, the person proposing to construct and own the facility was required to apply for "preliminary" certification for the BETC based on estimated total costs. *See* ORS 469B.145. The Oregon Department of Energy (ODOE) was required to undertake a technical review, for example, to verify the availability of the renewable resource, the proposed electrical generation capacity, and the existence of necessary permits. *See* ORS 469.205(2) (2007); OAR 330-090-0130(4) (2008). Legislation and rules applicable to more recent facilities added job-creation and verification requirements with which an applicant for preliminary certification must promise to comply. *See* ORS 469B.145(2) (information showing facility will operate at least five years; number of jobs; compliance with sustainable building practices, etc.). The applicant was required to indicate whether it planned to transfer the BETC but was not required to immediately identify a transferee. *See* OAR 330-090-0130(8) (2008).

Second, at the time of completion, the project owner was required to apply to ODOE for "final" certification based on actual costs and undergo a second technical review based on actual data. *See* ORS 469B.161(2). The function of a final certificate was to substantiate that the facility had "received final certification" from ODOE and that the person shown on the certificate was entitled to use the credit to offset tax liability. *See* ORS 469B.167; ORS 315.354(3)(b). When applying for final certification, the project owner could choose, by default, to receive a final certificate for the entire amount of the BETC in the name of the project owner. Alternatively, the project owner could ask ODOE to issue

---

[7] A person holding a BETC (or other credit) was required to use the entire amount of credit available for the tax year, up to the holder's tax liability for the year. *See* ORS 314.078; *see also Smurfit Newsprint Corp. v. Dept. of Rev.*, 329 Or 591, 997 P2d 185 (2000) (predating ORS 314.078).

the final certificate to a "transferee"[8] by providing ODOE proof that the transferee had paid the project owner the present value of the BETC in cash. *See* OAR 330-090-0130 (10)(b)(ii)(I) (2012).[9] This feature enhanced the BETC's usefulness to developers of large, capital-intensive energy conservation projects such as wind or solar farms that might take years to generate Oregon tax liability due to large initial deductions for project costs.[10] Oregon law allowed only the project owner at the time of completion to "transfer" the BETC in this manner; there was no mechanism for that first transferee to make any further transfer. *See* ORS 469B.167; *see also* ORS 315.052 (prohibiting second transfer of any credit absent express provision in underlying credit statute). Only the person named on the certificate could claim the credit. *See* ORS 469B.167(1)(a). Oregon law also set the discounted lump-sum price for the transfer of a BETC at its

---

[8] Confusingly for tax professionals, the ODOE administrative rules referred to a transferee as a "pass-through partner." *See* OAR 330-090-0110(49) (2008) (defining that term as a "person *** accepting a tax credit certificate in return for a cash payment equivalent to the net present value of the BETC"). Despite this label, ORS 315.053 restricted permissible transferees to only C corporations, S corporations, or personal income taxpayers, thus excluding partnerships. A project owner could retain a portion of the BETC and sell portions of it, such that ODOE might issue multiple final certificates, the face value of which would add up to the total amount of BETC available for the project.

[9] To reiterate: The statutory term "transfer" referred to the project owner's transfer of its right to *receive* a final certificate *from ODOE*. When the project owner made this choice, ODOE issued only one final certificate (to the transferee); the project owner never received a final certificate and thus never literally transferred a certificate to the transferee. A separate mechanism existed for the sale or other disposition of a *facility* to a new project owner. A project owner that had chosen to receive a final certificate in the project owner's own name, and that later sold or otherwise transferred the facility to a new project owner before using all of the BETC could notify ODOE of the facility transfer and allow the new project owner to apply for a final certificate allowing the new project owner to claim remaining amounts of BETC that the original project owner had not used. *See generally* ORS 315.354(5). No facility transfer is at issue in this case, and this order uses the term "transferee" to refer only to a person to whom ODOE issued an original final certificate for which the person had paid a project owner at present value.

[10] *See* IRC §§ 167 - 168 (allowing property owner deductions over time to reflect depreciation, including in certain years so-called "bonus" depreciation deductions); *id*. § 179 (allowing property owner to immediately deduct as an expense the cost of certain business property); *see generally* Thomas W. Giegerich, *The Monetization of Business Tax Credits*, 12 Fla Tax Rev 709, 720-69 (2012) (recounting history of monetization of federal tax credits as means to add incentive to project owners unable to use credits due to depreciation and other deductions).

"present value," as determined periodically by ODOE. *See* ORS 469B.148.[11]

Once the final certificate or certificates were issued, the same set of rights generally applied, regardless of whether the certificate holder was the project owner or a transferee. Both kinds of holders acquired the right to use the BETC to pay their Oregon personal or corporate income tax liability. Both kinds of holders had the right to exclude others in the sense that only the person named on the final certificate could claim the credit. Both kinds of holders were subject to the same requirement to claim the BETC over a five-year period, although the five-year period might start in a later year for a transferee than for the project owner, depending on the date the transferee paid for the credit. *See* ORS 469B.167(1), (2). Both kinds of holders bore the risk that Oregon income tax liability might prove too small to use the entire credit in any of the five years (plus carry-forward). This meant that the expected benefit from the BETC could fail to materialize if the holder were to suffer a business downturn, move to another state and cease to have Oregon income, or in the case of an individual holder, die.

The rights of a project owner and a transferee differed significantly with respect to revocation: ORS 469B.169(1) allowed ODOE to revoke a BETC certification if obtained by fraud or misrepresentation, if the facility was not operated in compliance with the certification procedures, or if it ceased to operate. However, a BETC held by a transferee could not be revoked. *See* ORS 469B.169(6). These provisions reflected the differing obligations of a project owner and a transferee. The transferee was not required to have any connection with the project or the project owner. The project owner bore the risk that no transferee would be found by the time the project was complete, inspected, and ready for final certification. The transferee's only obligation was to pay, in cash, the administratively determined present value of the amount of credit the transferee wished to use over the five-year period.

---

[11] Recall that the holder of a BETC was required to claim it over not fewer than five tax years.

B.  *Legal Background on Determination of Income*

Oregon imposes tax on the "entire taxable income of every resident of this state." ORS 316.037(1)(a). "Taxable income" means "taxable income" as defined under federal law, subject to Oregon-specific modifications not at issue here. ORS 316.022(6); ORS 316.048. Section 63 of the Code defines "taxable income" as "gross income" minus deductions.[12] Section 61 defines "gross income" as "all income from whatever source derived, including * * * [g]ains derived from dealings in 'property[.]" IRC § 61(a)(3) (emphasis added). "Gains from dealings in property" are computed according to section 1001(a):

"(a)   Computation of Gain or Loss.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain * * *.

"(b)   Amount Realized.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *"[13]

Thus, in order for taxpayers to have realized gain under sections 61(a)(3) and 1001, the BETC must have constituted "property" in taxpayers' hands, and taxpayers' use of the BETC must have constituted a "sale or other disposition" of the BETC. The department argues that taxpayers acquired property when they bought the BETC and that they disposed of the BETC when they used it. Taxpayers argue that they stepped into the shoes of the project owner when they bought the BETC, and that the BETC was not "property" for them, nor their use of it a "disposition" of BETC, any more than if they had been the project owner.

C.  *Was the BETC property in taxpayers' hands?*

To determine whether the BETC was "property," as that term is used in sections 61 and 1001 of the Code, the

---

[12] References to the "Code," "IRC," or to a "section," are to the Internal Revenue Code of 1986, as amended, and as incorporated by Oregon law.

[13] As a general rule, when property is sold or otherwise disposed of, any gain realized must also be "recognized" and counted as income, absent a nonrecognition provision in the Code. *See, e.g.*, *King Enterprises, Inc. v. United States*, 418 F 2d 511, 514, 189 Ct Cl 466 (1969). Neither party contends that a nonrecognition provision applies here.

court applies federal principles of statutory construction. *See Dept. of Rev. v. Marks*, 20 OTR 35, 40 (2009). Federal courts start by examining any definition contained within the Code provision using the term. *See* Boris Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 4.2 (2020) (summarizing principles of statutory construction of federal tax statutes).[14] However, neither section 61 nor section 1001 defines the key term "property." The United States Supreme Court has not defined whether a purchased tax credit constitutes "property" of its holder. However, when confronted with the undefined term "property" in other Code provisions, the Court has developed an overall approach, discussed below. This court first analyzes the Supreme Court's approach, then looks to opinions of lower federal courts and other sources for any persuasive value.[15]

    1.   *The* Craft *and* Drye *test*

In applying the federal tax lien statute, section 6321,[16] one of the most frequently litigated Code provisions that use the term "property" without defining it, the United States Supreme Court has developed a two-step analysis. First, state law controls in determining the nature of the taxpayer's legal interests. *Aquilino v. United States*, 363 US 509, 513, 80 S Ct 1277, 4 L Ed 2d 1365 (1960) (applying predecessor of IRC section 6321). Second, "federal law \*\*\*

---

[14] For explanations and commentary on methods and approaches federal courts take when construing the Code, see generally James J. Brudney & Corey Ditslear, *The Warp and Woof of Statutory Interpretation: Comparing Supreme Court Approaches in Tax Law and Workplace Law*, 58 Duke LJ 1231 (2009); Jonathan H. Choi, *The Substantive Canons of Tax Law*, 72 Stan L Rev 195 (2020); Jonathan H. Choi, *An Empirical Study of Statutory Interpretation in Tax Law*, 95 NYU L Rev 363 (2020).

[15] *See J. M. v. Oregon Youth Auth.*, 288 Or App 642, 645-46, 406 P3d 1127 (2017), *aff'd*, 364 Or 232, 434 P3d 402 (2019) (Oregon courts bound by interpretations of federal law by Oregon Supreme Court and United States Supreme Court, not bound by interpretations by federal Circuit Courts or other federal courts). By contrast, the department, in its administration of the personal income tax law, must apply and follow the administrative and judicial interpretations of the federal income tax law, and follow the rule observed by the Commissioner of Internal Revenue if federal court opinions conflict. *See* ORS 316.032(2).

[16] Section 6321 provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount \*\*\* shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

determine[s] whether the taxpayer's state-delineated rights qualify as 'property' ***." *United States v. Craft*, 535 US 274, 278-79, 122 S Ct 1414, 152 L Ed 2d 437 (2002) (quoting *Drye v. United States*, 528 US 49, 58, 120 S Ct 474, 145 L Ed 2d 466 (1999) (internal quotations omitted)).[17] In cases involving not only tax liens but also gift tax the Supreme Court has identified key rights that determine whether the total "bundle of sticks" constitutes property. *See Craft*, 535 US 274; *Drye*, 528 US 49*; Dickman v. Commissioner*, 465 US 330, 104 S Ct 1086, 79 L Ed 2d 343 (1984) (gift tax).

Applying the first step to this case, taxpayers' rights in the BETC were as set forth above: to use a specific amount of BETC to pay their Oregon personal income tax liability over five years plus carryforward; to exclude others from doing so; and to be held harmless from revocation of the BETC, even if the right of the project owner to claim or transfer the BETC was acquired by fraud or misrepresentation, and even if the facility failed to comply with certification procedures or ceased to operate.

Taking the second step, the court now analyzes whether these rights constituted "property" for purposes of sections 61(a)(3) and 1001. The United States Supreme Court's most recent opinion, in *Craft*, held that a husband's rights in real property that he held along with his wife as a tenant by the entirety constituted property for purposes of the federal lien statute. 535 US 274. The Court summarized the husband's entirety rights under state law as

> "the right to use the property, the right to exclude third parties from it, the right to a share of income produced from it, the right of survivorship, the right to become a tenant in common with equal shares upon divorce, the right to sell the property with the respondent's consent and to receive half the proceeds from such a sale, the right to place an encumbrance on the property with the respondent's consent, and the right to block respondent from selling or encumbering the property unilaterally."

---

[17] The Court has applied a similar approach in other areas of federal tax law. *See Morgan v. Commissioner*, 309 US 78, 60 S Ct 424, 84 L Ed 1035 (1940) (analyzing meaning of "general power of appointment" for federal estate tax purposes; recognizing that "[s]tate law creates legal interests and rights," while "federal revenue acts designate what interests or rights, so created, shall be taxed").

*Id.* at 282. The Court characterized as "some of the most essential property rights" the rights to use the property, to receive income produced by it, and to exclude others from it. *Id.* at 283. The Court stated that "[t]hese rights alone may be sufficient to subject the husband's interest in the entireties property to the federal tax lien" because they gave him a "substantial degree of control" over the property. The Court also discussed the husband's additional right to alienate or encumber the property with the consent of his wife. *Id.* Acknowledging that the husband's right of alienation was less than total because it was not unilateral, the Court noted that "[t]here is no reason to believe, however, that this one stick—the right of unilateral alienation—is essential to the category of 'property.'" *Id.* at 284.

Three years before *Craft*, the Court held in *Drye* that a son who was his mother's sole heir under state intestacy law held "property" for purposes of section 6321 on the date his mother died intestate, even though he later disclaimed his interest in favor of his daughter. The Court focused on the "breadth of the control" that the son could exercise over the property. *Drye*, 528 US at 61. The Court considered two arguments related to transferability of the son's interest. First, the Court recounted the Eighth Circuit's observation that state law would have allowed the son to assign his right to inherit even before his mother's death and would have enforced the assignment when the expectancy ripened into a present estate. *Id.* at 59-60. The Court declined to rely on that right, however. *Id.* at 60 n 7 ("Nor do we mean to suggest that an expectancy that has pecuniary value and is transferable under state law would fall within [section] 6321 prior to the time it ripens into a present estate."). Second, the Court considered and rejected the son's argument that his disclaimer prevented him from exercising dominion over the property, as occurs when a donee refuses a gift. *Id.* at 60-61. The Court concluded that a right to disclaim confers control on the heir by allowing him to "channel" the value of the property to another family member, as opposed to restoring the status quo *ante*. *Id.* In the course of analyzing these two arguments relating to transferability, the Court noted:

> "[W]e do not mean to suggest that transferability is essential to the existence of 'property' or 'rights to property'

under [section 6321]. For example, although we do not here decide the matter, we note that an interest in a spendthrift trust has been held to constitute 'property' for purposes of [s]ection 6321 even though the beneficiary may not transfer that interest to third parties."

*Id.* at 60 n 7 (citation omitted).

From these two cases the court concludes that property, at least for purposes of application of a federal tax lien, exists when someone has sufficient right to use or control something. The Court in *Drye* expressly found the son's "control rein" after his mother's death determinative. *Id.* at 61. By contrast, the Court was not willing to opine that a mere expectancy would constitute property. In *Craft* the Court included a list of rights that informed the Court's conclusion; however, each of them ultimately reduces to the right of use. The "right to exclude third parties" is a logical corollary of the right to use. The rights to "sell" or "encumber" something, or to receive "a share of income" from it, are the right to use that thing in a specific way to receive money. And the features that the Court in *Craft* described as the husband's specific rights as a tenant by the entirety—survivorship, conversion to a joint tenancy upon divorce, and blockage of the spouse's use—could alternatively be characterized as limitations defining the husband's right of use.

An earlier case involving the predecessor of section 6321, *United States v. Bess*, 357 US 51, 78 S Ct 1054, 2 L Ed 2d 1135 (1958), distinguished between two kinds of rights arising from a life insurance contract. A surviving spouse contended that no lien attached to any rights that her decedent husband held in a life insurance policy. The Court held that the death benefit did not constitute property to the husband, because during his life the husband had no right to receive the death benefit payment or to reduce the benefit to cash in the hands of another. *Id.* at 55-56. The Court held, however, that the rights to the "cash surrender value" of the policy did constitute property because the husband could have received that value in cash during his life, or could have assigned, borrowed against, or pledged that amount. *Id.* at 56. Although the Court referred to the right of assignment, this court views that right as only one attribute supporting the conclusion that the right to the cash surrender value

constituted property. The overall test in *Bess* is whether the money represented by either the cash surrender value or the proceeds was reducible to "possession," a term the Court used four times. *See id.* at 55-56. This court finds that test consistent with the test of "use" applied in *Craft* and *Drye*.

Outside the context of a lien under section 6321, the Supreme Court has held that the making of an interest-free loan from parent to child constitutes a transfer of "property" by gift, triggering federal gift tax pursuant to section 2501(a)(1). *Dickman v. Commissioner*, 465 US 330, 338, 104 S Ct 1086, 79 L Ed 2d 343 (1984). The Court stated: "We have little difficulty accepting the theory that the use of valuable property—in this case money—is itself a legally protectible property interest. Of the aggregate rights associated with any property interest, the right of use of property is perhaps of the highest order." *Id.* at 336 (superseded by IRC section 7872).

This court next turns to whether and how to apply the Supreme Court's test for "property" to sections 61(a)(3) and 1001 in this case. The Supreme Court has declared that the "normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Secretary*, 475 US 851, 860, 106 S Ct 1600, 89 L Ed 2d 855 (1986) (internal citations omitted) (applying definition of "overpayment" from within same subchapter of the Code). Among the questions the Court asks is whether "the scope of the legislative power exercised in one case is broader than that exercised in another * * *." *Atlantic Cleaners & Dryers, Inc. v. United States*, 286 US 427, 433, 52 S Ct 607, 76 L Ed 1204 (1932) (quoted in *Sorenson*). The Court has repeatedly concluded that Congress intended the tax lien and gift tax provisions at issue in the foregoing cases to have a broad reach. *See Craft*, 535 US at 283 ("The statutory language authorizing the tax lien is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have.") (internal quotation omitted); *Dickman*, 465 US at 334 (referring to the "broad sweep of the tax imposed by [section] 2501"). Likewise, in this case, it is a foundational principle of federal income tax law that Congress intended the definition of "gross income" in section

61 to have a vast scope. *E.g.*, *Comm'r. v. Glenshaw Glass Co.*, 348 US 426, 429-30, 75 S Ct 473, 99 L Ed 483 (1955) (citing *Comm'r v. Jacobson*, 336 US 28, 49, 69 S Ct 358, 93 L Ed 477 (1949), and *Helvering v. Stockholms Enskilda Bank*, 293 US 84, 87-91, 55 S Ct 50, 79 L Ed 211 (1934)). Section 1001(a) is closely linked to section 61(a)(3).[18] This court finds it appropriate to test taxpayers' rights in the BETC against the broad definition of "property" in *Craft* and *Drye*.

Upon doing so, the court concludes that taxpayers' rights in the BETC are "property." Taxpayers held certificates bearing their names that entitled them to offset their future Oregon income tax liability by specified amounts. They thus held the exclusive right to "use" the BETC for the purpose the legislature intended. *See Con-Way*, 353 Or 616 (repeatedly referring to "use" of the BETC to "pay" or "satisfy" tax liability). Although that right appears to suffice under the Supreme Court's analysis, the court notes that taxpayers' ordinary right of exclusive use was enhanced because that right could not be defeated by a claim that the project owner had acquired the BETC by fraud or noncompliance. Finally, this court finds no facts comparable to those in *Drye* (the "mere expectancy" of an inheritance) or *Dickman* (the inability to tap one's own death benefit) that might put the use or possession of the BETC beyond the reach of taxpayers. *See also Crapper v. Berliner's Inc.*, 269 Or 117, 123-24, 523 P2d 1025 (1974) (for purposes of section 6321, delinquent taxpayer held no property interest in funds held by attorney pursuant to agreement for the benefit of creditors, where agreement provided taxpayer no right to funds until all creditors satisfied).

The court next looks to decisions of other federal courts cited by the parties to identify whether there is authority to persuade this court to reach a different conclusion. In *Virginia Historic Tax Credit Fund 2001 LP v.*

---

[18] The United States Supreme Court has described the phrase "sale or other disposition" in section 1001 as the "controlling statutory language" to determine whether "gains derived from dealings in property" arise under section 61(a)(3). *United States v. Davis*, 370 US 65, 68-69, 82 S Ct 1190, 8 L Ed 2d 335 (1962). A leading income tax treatise expands on the link between the statutes, stating: "[Section] 61(a)(3) does not specify how gains from 'dealings in property' are to be computed. That function is discharged by [section] 1001(a) ***." Bittker, *Federal Taxation of Income, Estates & Gifts* ¶ 40.1.

*Commissioner*, 639 F3d 129 (4th Cir 2011),[19] the Fourth Circuit applied *Craft* and *Drye* in determining whether transactions in which partners contributed money to partnerships and received allocated shares of state income tax credit constituted a "sale or exchange" of "property" within the meaning of section 707(a)(2)(B) of the Code, commonly referred to as the "disguised sale" rule.[20] In considering *whether* to apply the broad definition under *Craft* and *Drye*, the court concluded that "including the exchange of tax credits for dollars within the scope of [section] 707 'property' *comports with Congress's intent to widen the provision's reach* in 1984." *Id.* at 142 (emphasis added) (examining legislative history instructing courts to "stringently" question whether certain transactions constituted disguised sales and directing the Treasury Department to adopt regulations applying "all the facts and circumstances"). The Fourth Circuit summarized the Supreme Court's test for "property" as follows:

> "Accordingly, to determine whether Virginia's historic rehabilitation tax credits are 'property' for federal tax purposes, we ask whether they embody 'some of the most essential property rights.' In particular, the Supreme Court in *Craft* identified the 'right to use the property, to receive income produced by it, and to exclude others from it,' as fundamental property rights. Similarly, in *Drye*, the Supreme Court placed primary emphasis on the 'breadth of the control the taxpayer could exercise over the property' and whether the right in question was 'valuable.' *Drye* noted that transferability, although not essential, is also a relevant factor."

---

[19] *See also Route 231, LLC v. Comm'r*, 810 F3d 247 (4th Cir 2016) (following *Virginia Historic Tax Credit Fund*).

[20] At all times since its enactment in 1986, section 707(a)(2)(B) has provided: "If—

"(i) there is a direct or indirect transfer of money or other property by a partner to a partnership,

"(ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and

"(iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,

"such transfers shall be treated either as a transaction described in paragraph (1) or as a transaction between 2 or more partners acting other than in their capacity as members of the partnership."

*Id.* at 141 (internal quotations omitted). The court then concluded that "the transfer of tax credits from the Funds to investors under the circumstances presented here constituted a transfer of 'property.'" *Id.* The court found that the credits had value and that the partnerships holding them "exercised proprietary control over the tax credits" by deciding how to allocate exclusive use of the credits. *Id.* at 141-42.[21]

This court discusses *Virginia Historic Tax Credit Fund* below, in connection with other arguments raised by the parties, but for the limited purpose of determining whether and how to apply the definition of *Craft* and *Drye*; the opinion confirms both the essence of the Supreme Court's test for "property" and the principle that that test should apply for purposes of determining whether use of the BETC is a disposition of "property" under sections 1001 and 61(a)(3).

2. *The parties' arguments as to "property"*

The court now reviews the parties' arguments regarding whether the BETC was "property" in the hands of taxpayers. Taxpayers argue that, under *Randall v. Loftsgaarden*, 478 US 647, 106 S Ct 3143, 92 L Ed 2d 525 (1986), a project owner choosing to use the BETC itself would not be treated as having gain from the disposition of property; as transferees, taxpayers claim they should receive the same tax treatment. The department acknowledges that, under *Randall*, a project owner has no gain when it uses a credit it received for investing in property. Nevertheless, the department asserts first that tax credits are property in the hands of a project owner *if and when* the owner chooses to sell

---

[21] The court notes that, in *Estate of McKelvey v. Commissioner*, the United States Tax Court referred to the definitions of "property" in *Craft* and *Dickman* in a case involving section 1001(a). 148 TC 312, 321-22 (2017), *rev'd and remanded on other grounds*, 906 F3d 26 (2d Cir 2018). In *McKelvey*, however, the court concluded that the taxpayer lacked *any* rights in the financial instruments that were the subject of the case. By the time the taxpayer sought to exchange the instruments for new instruments with more favorable terms, the taxpayer had only *obligations* under the original instruments. *Id.* at 323. The Tax Court also cited *Drye* in passing in *Maines v. Comm'r*, 144 TC 123, 136 (2015), but the issue there was factually inapposite—whether cash payments that the taxpayers as project owners received in excess of their liability (the "refundable" portion of a New York state credit) were includible in income.

the credits to a transferee (as concluded in *Virginia Historic Tax Credit Fund*), and second, that tax credits remain property when they pass to the transferee. ("What is 'property' to the seller is 'property' to the buyer; the property sold is property purchased.") Because each party thus argues by reference to the tax treatment of the project owner, the court reviews the state of the law on that subject.

In *Randall*, investors in a venture to build and operate a motel successfully sued the promoters for securities fraud, but the Court had to decide whether to reduce the investors' award to reflect the fact that they were entitled to federal income tax deductions and other tax benefits. *See* 15 USC § 77*l*(2) (allowing defrauded investor to recover consideration paid "less the amount of any income received thereon * * *"); *id.* § 78bb(a) (prohibiting recovery in excess of "actual damages"). The Court determined that the

> "tax benefits attributable to ownership of a security initially take the form of tax deductions or tax credits. These have no value in themselves; the economic benefit to the investor—the true 'tax benefit'—arises because the investor may offset tax deductions *against* income * * *. [T]he 'receipt' of tax deductions or credits is not itself a taxable event, for the investor has received no money or other 'income' within the meaning of the Internal Revenue Code. *See* 26 U.S.C. § 61. Thus, we would require compelling evidence before imputing to Congress an intent to describe the tax benefits an investor derives from tax deductions or credits attributable to ownership of a security as 'income received thereon.'"

*Randall*, 478 US at 656-57 (emphasis in original). The Court specifically declined to characterize the tax benefits at issue as "consideration or property." *Id.* at 658.

The *Randall* Court did not explain its conclusion that the investors had no property interest in, or income from, the tax benefits. The result may, as the department argues, derive from the concept that "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *United States v. Carlton*, 512 US 26, 33, 114 S Ct 2018, 129 L Ed 2d 22 (1994) (allowing estate tax assessment based on federal law change enacted with retroactive effect); *see also Atlantic Richfield Co. v. Dept. of*

*Rev.*, 14 OTR 212, 215, 218 (1997), *aff'd*, 327 Or 144, 958 P2d 840 (1998).[22] In any event, taxpayers here assert the same treatment for themselves—that the BETC in their hands should be ignored as neither property nor capable of generating income. The department rejects that position based in part on the Fourth Circuit's holding in *Virginia Historic Tax Credit Fund*. This court concludes that *Randall* is readily distinguishable and that it is unnecessary to rely on *Virginia Historic Tax Credit Fund* to resolve this case.[23]

A closer review of the facts in *Randall* shows that the individuals who were the investors in that case contributed

---

[22] The parties at times seem to suggest a variation of this rationale for the result in *Randall*: that a project owner should not be taxed on the receipt (or use) of a tax benefit because the project owner is simply complying with the law of the federal, state, or local government that is exercising its sovereign authority to bestow the tax benefit, presumably in order to incent or regulate particular behavior. While that rationale may have more immediate superficial appeal when considering the owner of a renewable energy facility, such a theory proves too much. Taxpayers correctly note that a court could conjure the same rationale to fit their circumstance: Taxpayers simply complied with the BETC transfer statutes, participating in an incentive program that marshaled private capital to financially support a socially favored project. Moreover, the rationale fails because *cash* subsidies to incent behavior typically are includible in gross income, subject to numerous specific statutory exclusions. *See* Bittker, *Federal Taxation of Income, Estates, & Gifts* ¶ 16.4; *see, e.g.*, IRC § 48(d)(3) (excluding certain grants for energy facilities under section 1603 of the American Recovery and Reinvestment Tax Act of 2009).

[23] Both parties in this case also refer to *Tempel v. Commissioner*, 136 TC 341 (2011), *aff'd sub nom Esgar Corp v. Comm'r*, 744 F3d 648 (10th Cir 2014). The issue in that case was the tax treatment of a couple who had received state income tax credits for donating a conservation easement on their land, and who then sold some of the credits for cash as allowed by state law. Notably, the taxpayers and the Internal Revenue Service (IRS) agreed that the credits were property in the taxpayers' hands when they sold the property; the court analyzed only whether the credits fit into the category of property constituting capital assets, the sale or exchange of which results in capital gain as opposed to ordinary income. *Id.* at 345 & n 4 (citing *Virginia Historic Tax Credit Fund*). The court concluded that the credits were capital assets when sold, implicitly also concluding that they were property at that time. In addressing the IRS's arguments for ordinary income treatment, the court laid groundwork for an explanation of why the credits would *not* be property to the original holder if *not* sold: the holder has no contractual rights in the credits, rather, the credits merely reflect the government's unilateral "decision to tax one taxpayer at a lower rate than another taxpayer." *Id.* at 348-51. Taxpayers in this case point to such statements, which are in accord with *Randall*. The department, meanwhile, refers to other parts of the opinion that describe the credits as property when sold. This court sees no need to adopt or reject the reasoning in *Tempel*. To the extent that *Randall* and *Virginia Historic Tax Credit Fund* may appear to offer two plausible alternative ways to treat BETC in the hands of taxpayers, *Tempel* adds nothing that breaks the tie.

money in order to become limited partners. The limited partnerships (through a tiered structure) spent the invested money on items that the promoters claimed would result in the construction of a successfully operating motel. It was the partnerships' expenditures that allowed the partnerships to report depreciation deductions and losses.[24] The investors, although limited partners, owned more than simply tax deductions or credits; through their interests in the partnerships they owned the motel project itself. The promoters urged the Court to reduce the investors' award to account for the "economic reality" that the investors were expecting three things in consideration for their investment: tax benefits, advantageously timed cash flow, and an ultimate equity interest in the project. *See* 478 US at 665. Without commenting on the factual accuracy of that contention, the Court concluded that Congress had not based the income offset requirement on those three factors. Even the task of computing the tax benefits for any particular investor would have been "formidable," and the Court found it inappropriate to try to do so in isolation from other benefits:

"[The promoters] essentially ask us to treat tax benefits as a separate asset that is acquired when a limited partner purchases a share in a tax shelter partnership. But the legal form of the transaction does not reflect this treatment. Petitioners purchased securities, thereby acquiring freely alienable rights to any income that accrued to them by virtue of their ownership. They did not, however, also acquire a separate, freely transferable bundle of tax losses that would have value apart from petitioners' status as partners. For obvious reasons, tax deductions and tax credits are not, in the absence of a statutory provision to the contrary, freely transferable from one person to another if wholly severed from the property or activity to which they relate: '[t]he statutes pertaining to the determination of taxable income … disclos[e] a general purpose to confine allowable losses to the taxpayer sustaining them, *i.e.*, to treat them as personal to him and not transferable to or usable by another.' *New Colonial Ice Co. v. Helvering*, 292

---

[24] Those deductions and losses then flowed through to the investors as partners by operation of federal income tax law and were available for the investor-partners to use on their individual income tax returns. *See generally* Bittker, *Federal Taxation of Income, Estates, & Gifts* ¶¶ 2.4; 87.1 (treatment of partnerships and partners).

U.S. 435, 440, 54 S. Ct. 788, 790, 78 L. Ed. 1348 (1934). Accordingly, we decline to treat these tax losses as so much property created by the promoters of the partnership."

*Id.* at 665-66 (second and third brackets in *Randall*); *see also* Charles E. Roberts, *Navigating the Safe Harbor When the Cargo Includes Federal and State Historic Credits*, 124 J Tax'n 5, 12 (July 2016).

None of these complexities are present for taxpayers, who as transferees paid cash solely for a credit against future tax liability. Taxpayers never became owners of a project or partners in a project-owner partnership. Indeed, state law shielded taxpayers from a significant risk of ownership by prohibiting revocation of the BETC against them even if the project were to fail or be found the subject of fraud after final certification. And in contrast to the "elaborate" computations that the Court declined to undertake in *Randall*,[25] the two main values relevant to this case are relatively easy to determine from the undisputed facts: taxpayers' "basis" in the BETC (essentially, their cost) and the "amount realized" (the amount of income tax liability they satisfied when they used the BETC).[26] The court concludes that, under *Craft* and *Drye*, and in contrast to the taxpayers in *Randall*, taxpayers acquired straightforward rights

---

[25] *See Randall*, 478 US at 656 (commenting on the Eighth Circuit's computations in *Austin v. Loftsgaarden*, 768 F2d 949, 958-60 (8th Cir 1985), *rev'd sub nom Randall v. Loftsgaarden*, 478 US 647, 106 S Ct 3143, 92 L Ed 2d 525 (1986)).

[26] *See* Bittker, *Federal Taxation of Income, Estates, & Gifts* ¶¶ 40.1; 40.2 (overview of concepts of amount realized, basis, and gain). In the case of a project owner, there also would be the challenge of whether and how to allocate *specifically to the credit* a portion of the costs incurred to build the project in order to compute the project owner's basis in the credit. *See* Robert Feldgarden, *The Federal Tax Treatment of State Tax Credits*, Tax Notes 560, 563 (May 3, 2010) (describing various possible frameworks for determining basis); Adam C. Kobos, *Recent Developments in the Taxation of Transferable State Tax Credits*, 38 J Corp Tax'n 38, 40 (July/Aug 2011). The Tax Court resolved this in *Tempel*, concluding that taxpayers had no basis in their state tax credits because "their rights in the credits, although achieved because of the property, arose on account of the grant from the State." 136 TC at 352-54 & n 23 (quoting *Solitron Devices, Inc. v. Comm'r*, 80 TC 1, 17 (1988) (declining to adopt the "unusual concept that cost basis can be allocated to property other than *** property purchased")). The Supreme Court in *Randall* did not reach the issue of a project owner's basis in, or amount realized from, a credit, because the Court concluded that the investors' rights in the tax deductions or credits could not be separated from their rights in the underlying project.

constituting a single item of property when they purchased the BETC.

The scope of the court's conclusion is narrow, as it seeks to apply two lines of federal judicial reasoning, of which one is significantly less developed: in contrast to the broad definition of "property" in *Craft* and *Drye* that has evolved over the course of multiple cases, the reach of the rule of *Randall* is less clear. In *Randall*, not only were the tax benefits nontransferable, they also were conceptually difficult to separate from the property constituting the project, for example for purposes of determining a partnership's basis in the tax attributes standing alone. In this case, the BETC is transferable in the hands of the project owner, but if the project owner retains it, the BETC remains bound up in the project owner's property rights in the project, both for purposes of determining basis and because the BETC is subject to revocation based on the project owner's behavior involving the property constituting the project. Moreover, the court is not aware of any persuasive authority for the proposition that the test, under *Craft* and *Drye*, for whether an item is property to a transferee depends on whether the item constituted property in the hands of the project owner.[27] For these reasons the court need not, and does not, express a view on the tax treatment of a BETC, or any other credit, in the hands of a project owner, regardless of whether that person later sells the credit.

### D.  *Did taxpayers "dispose of" the BETC?*

Having concluded that the BETC was "property" in taxpayers' hands for purposes of sections 61(a)(3) and 1001, the court must determine whether taxpayers' use of the BETC to offset their income tax liability constituted a "disposition"

---

[27] The department refers to Chief Counsel Advisory (CCA) 201147024 (2011) and other administrative determinations by the IRS as consistent with the department's conclusion that the transferee of a state tax credit acquires property. Notwithstanding taxpayers' criticisms, the court finds it perfectly acceptable for any party to present IRS determinations to the court solely for their persuasive value, as the department did here. It is not relevant in this case that the IRS might limit a practitioner's right to cite such determinations as precedent, because these kinds of determinations are not binding on this court in any event as discussed above. As it happens, however, the court finds nothing in the determinations that explains persuasively why the status of a credit as property to a transferee is connected to its status in the hands of the project owner.

of property under IRC section 1001(a).[28] Federal courts have long construed section 1001(a) broadly: "[I]t is settled that the realization of gain need not be in cash derived from the sale of an asset. Gain may occur as a result of exchange of property, *payment of the taxpayer's indebtedness, relief from a liability*, or other profit realized from the completion of a transaction." *Helvering v. Bruun*, 309 US 461, 469, 60 S Ct 631, 84 L Ed 864 (1940) (emphasis added). It also is settled that the term "disposition" in section 1001(a) is not limited by its disjunctive pairing with the word "sale." *E.g.*, *Herbert's Estate v. Comm'r*, 139 F2d 756, 758 (3d Cir 1943). Rather, "disposition" has a freestanding meaning, and its ordinary definition encompasses "'[t]he getting rid, or making over, of anything; relinquishment.'" *Id.* (quoting *Webster's New International Dictionary* 752 (2d ed 1941)). Accordingly:

> "When property is transferred in satisfaction of a debt, the transaction is functionally equivalent to a sale of the property for cash, coupled with a use of the proceeds to pay the debt. The shortcut device of transferring the property directly to the creditor thus is ordinarily a "sale or other disposition" of the property within the meaning of [section] 1001(a), on which gain or loss is realized. For example, a taxpayer who uses stock that cost $750 to pay a shopkeeper's bill of $1,000 realizes gain of $250, just as though the stock had been sold for $1,000 and the proceeds used to pay the bill."

Bittker, *Federal Taxation of Income, Estates, & Gifts* ¶¶ 40.4.1; 40 (footnote omitted).[29] Taxpayers' tax liability was "a personal debt, due the state of Oregon." ORS 314.440(1). As an income tax liability, it was a type of debt that could be paid using a credit allowed under state law. *Con-Way*, 353 Or at

---

[28] Section 1001(a) refers to a "sale or other disposition." Neither party argues that taxpayers "sold" the tax credit back to the state when they used it. The court agrees.

[29] Compare the narrower scope of the term "exchange" used in section 1222 to determine whether the gain from a transaction is "capital" in nature. IRC § 1222(1)‑(11) (referring repeatedly to gain or loss from the "sale or exchange" of a capital asset). The department initially argued that taxpayers realized long‑term capital gain when they used the BETC to reduce their Oregon taxable income. The department later amended its argument, asserting instead that taxpayers realized ordinary income on that transaction. The court does not understand taxpayers to be contesting the department's revised position. If taxpayers dispute the character of their gain as ordinary income, the court invites the parties to confer and bring that issue to the court's attention.

631. Taxpayers did that and realized gain on their disposition of the BETC when they did so.

## IV.   CONCLUSION

The court concludes that the BETC was "property" in the hands of taxpayers within the meaning of sections 61(a)(3) and 1001, and that they "disposed" of that property to the extent that they used the credit to offset their Oregon tax liability in 2012, 2013, and 2014. The court concludes that taxpayers realized gain equal to the difference between the amount of tax liability offset by the BETC and their basis in the BETC. Now, therefore,

IT IS ORDERED that Defendants' cross-motion for summary judgment is denied; and

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment is granted.